728 A.2d 166

Jeanette **WRIGHT** et al.

v.

The **JOHNS HOPKINS HEALTH SYSTEMS CORPORATION** et al.

No. 71, Sept. Term, 1998.

Court of Appeals of Maryland.

April 20, 1999.

Matt R. Ballenger (T. Christine Pham, Suder & Suder, P.A., on brief) of Baltimore, for appellants.

Carol A. Zuckerman (Eric R. Harlan, Whiteford, Taylor & Preston, L.L.P., on brief) of Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

In this action the estate and parents of an unmarried decedent sue a number of health care providers on the ground that the defendants wrongfully prolonged the decedent's life by resuscitating him from cardiac arrest, allegedly contrary to the instructions in his advance directive and to his expressed intent. The Circuit Court for Baltimore City granted the defendants' motion for summary judgment. For the reasons set forth below, we shall affirm.

The petitioners, plaintiffs below, are Jeanette Wright, individually and as personal representative of the Estate of Robert Lee Wright, Jr. (Wright), and Robert Lee Wright, Sr., individually. The respondents, defendants below, are the Johns Hopkins Health Systems Corporation, the Johns Hopkins Hospital, and the Johns Hopkins University (collectively, Johns Hopkins), and four physicians, individually and as agents of Johns Hopkins, John Bellan, M.D., Larry Buxbaum, M.D., James Miller, M.D., and John Bartlett, M.D. (collectively, the defendant physicians).

The complaint alleges breaches of duty under statutory and common law which we shall review before presenting the facts of this case.

## I. The Common Law and the Health Care Decisions Act

In *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the United States Supreme Court emphasized that a liberty interest under the Fourteenth Amendment gives rise to a constitutionally protected right to refuse life-sustaining medical proce-

dures. *Id.* at 281, 110 S.Ct. at 2853, 111 L.Ed.2d at 243 ("It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."). *See Mack v. Mack,* 329 Md. 188, 211, 618 A.2d 744, 755–56 (1993) ("Although the United States Supreme Court's decision in *Cruzan* made no holding on the subject, all of the justices, save Justice Scalia, either flatly stated or strongly implied that a liberty interest under the Fourteenth Amendment gives rise to a constitutionally protected right to refuse life saving hydration and nutrition.") (citation omitted).

■ Under Maryland common law, a competent adult has the right to refuse medical treatment and to withdraw consent to medical treatment once begun. *Mack,* 329 Md. at 210–11, 618 A.2d at 755–56. The right exists even though an individual is unable to exercise that right for himself. *Id.* at 211, 618 A.2d at 756. This right is a corollary to the common law doctrine of informed consent, which

" 'follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient. The fountainhead of the doctrine ... is the patient's right to exercise control over his own body, ... by deciding for himself whether or not to submit to the particular therapy.' "

*Id.* at 210, 618 A.2d at 755 (quoting *Sard v. Hardy,* 281 Md. 432, 438–39, 379 A.2d 1014, 1019 (1977)) (citation omitted).

■ This right is not absolute, but is subject to at least four countervailing State interests:

" '(1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession.' "

*Id.* at 210 n. 7, 618 A.2d at 755 n. 7 (quoting *Brophy v. New England Sinai Hosp., Inc.,* 398 Mass. 417, 432, 497 N.E.2d 626, 634 (1986)).

■ Additionally, where another is speaking on behalf of an incapacitated individual, it is that person's burden to prove, by clear and convincing evidence, the critical facts demonstrating that the incapacitated individual's judgment is, or would be, that life-sustaining procedures should be withheld or withdrawn were that individual to be in a certain condition. *See Mack*, 329 Md. at 208, 618 A.2d at 754 (holding that "requests to withdraw sustenance from a person in a persistent vegetative state [require] the proponent of withholding or withdrawing life support to bear the burden of proving by clear and convincing evidence that the ward's decision would have been to forego life support").

In addition to constitutional and common law rights to refuse life-sustaining medical procedures, an individual's ability to direct in advance his choice concerning whether to refuse life-sustaining procedures is based in statutory law. Prior to October 1993, the Life–Sustaining Procedures Act governed the form and effect of advance directives. Md.Code (1982, 1990 Repl.Vol.), §§ 5–601 through 5–614 of the Health–General Article. The Life–Sustaining Procedures Act permitted an individual, who was qualified to execute a will, to execute a declaration, called an advance directive, directing the withholding or withdrawal of life-sustaining procedures in the event two physicians certified the individual to be in a terminal condition. *Id.* § 5–602.

This act was criticized, especially in that the advance directives only applied to individuals imminently facing death, without including individuals in a persistent vegetative state, and the act was ambiguous with regard to the withholding or withdrawal of artificially administered sustenance necessary for comfort care and to alleviate pain. J.C. Byrnes, *Life–Support Withdrawal: Law of Commiseration or Principle?*, 2:2 Md. J. Contemp. Legal Issues 331, 348–49 (1991). As Attorney General Curran observed in 1988, decisions about life-sustaining medical procedures were being made "against a background of legal confusion." 73 Op. Att'y Gen. 162, 169 (1988).

In May 1993, the General Assembly repealed the Life–Sustaining Procedures Act and enacted the Health Care Decisions Act (the Act), by Chapter 372 of the Acts of 1993, codified in Md.Code (1982, 1994 Repl.Vol., 1998 Cum.Supp.), §§ 5–601 through 5–618 of the Health–General Article (HG).[1] The Act overlies an individual's existing common law right to refuse life-sustaining medical procedures:

"The provisions of this subtitle are cumulative with existing law regarding an individual's right to consent or refuse to consent to medical treatment and do not impair any existing rights or responsibilities which a health care provider, a patient, including a minor or incompetent patient, or a patient's family may have in regard to the provision, withholding, or withdrawal of life-sustaining procedures under the common law or statutes of the State."

§ 5–616(a).

The Act establishes the framework by which health care decisions may be made. An individual, called the declarant, may make an advance directive. This may be done orally or in writing. § 5–601(b). The declarant may also appoint an agent for health care. § 5–601(c). Or, the decision may be made by some other surrogate. § 5–605.

Under the Act "[a]ny competent individual may, at any time, make a written advance directive regarding the provision of health care to that individual, or the withholding or withdrawal of health care from that individual." § 5–602(a). The writing must be signed by or at the express direction of the declarant, dated, and subscribed by two witnesses. § 5–602(c)(1).

With regard to an oral advance directive, the Act provides that "[a]ny competent individual may make an oral advance directive to authorize the providing, withholding, or withdrawing of any life-sustaining procedure or to appoint an agent to make health care decisions for the individual." § 5–602(d). An

---

1. Unless otherwise noted, all statutory references are to the Health–General Article.

oral advance directive made after October 1, 1993, must be "made in the presence of the [declarant's] attending physician and one witness and documented as part of the [declarant's] medical record." *Id.* The attending physician and the witness must sign and date the documentation in the medical record. *Id.*

It is the responsibility of the declarant to notify the attending physician that the declarant has made an advance directive; if the declarant is comatose, incompetent, or otherwise incapable of communication, any other person may notify the attending physician. § 5–602(f)(1).

Once an attending physician is notified of a written advance directive the physician must make the advance directive, or a copy of it, a part of the declarant's medical records. § 5–602(f)(2)(i). Once an attending physician is notified of an oral advance directive, the physician must "make the fact of the advance directive, including the date the advance directive was made and the name of the attending physician, a part of the declarant's medical records." § 5–602(f)(2)(ii).

An advance directive becomes effective either when conditions specified by the declarant are determined to have been satisfied in the manner specified by the declarant or "when the declarant's attending physician and a second physician certify in writing that the patient is incapable of making an informed decision" regarding the treatment. §§ 5–602(e)(1), 5–606(a)(1). This certification must be made prior to providing, withholding, or withdrawing medical treatment, and within two hours after the declarant has been personally examined by one of the two certifying physicians. § 5–606(a)(1). An adult is considered to be "incapable of making an informed decision" when the declarant is unable

"to make an informed decision about the provision, withholding, or withdrawal of a specific medical treatment or course of treatment because the patient is unable to understand the nature, extent, or probable consequences of the proposed treatment or course of treatment, is unable to make a rational evaluation of the burdens, risks, and bene-

fits of the treatment or course of treatment, or is unable to communicate a decision."
§ 5–601(*l*)(1). Compare §§ 5–602(e)(2), 5–606(a)(2) (providing that, if the declarant is unconscious or unable to communicate by any means, only the written certification of the attending physician is required).

Additionally, where the declarant has an advance directive but has *not* appointed a health care agent, a health care provider cannot withhold or withdraw life-sustaining procedures[2] on the basis of the advance directive unless two physicians certify that the declarant is in one of three diagnostic conditions: a terminal condition, an end-stage condition, or a persistent vegetative state. § 5–606(b). If the condition is a terminal condition[3] or an end-stage condition,[4] the declarant's attending physician and a second physician must certify that the declarant is in a terminal or end-stage condition. § 5–606(b)(1). If the condition is a persistent vegetative state,[5]

---

**2.** Section 5–601(m) of the Act defines a "life-sustaining procedure" as follows:

"(1) 'Life-sustaining procedure' means any medical procedure, treatment, or intervention that:

"(i) Utilizes mechanical or other artificial means to sustain, restore, or supplant a spontaneous vital function; and

"(ii) Is of such a nature as to afford a patient no reasonable expectation of recovery from a terminal condition, persistent vegetative state, or end-stage condition.

"(2) 'Life-sustaining procedure' includes artificially administered hydration and nutrition, and cardiopulmonary resuscitation."

**3.** Section 5–601(q) defines a "terminal condition" as

"an incurable condition caused by injury, disease, or illness which, to a reasonable degree of medical certainty, makes death imminent and from which, despite the application of life-sustaining procedures, there can be no recovery."

**4.** Section 5–601(i) defines an "end-stage condition" as

"an advanced, progressive, irreversible condition caused by injury, disease, or illness:

"(1) That has caused severe and permanent deterioration indicated by incompetency and complete physical dependency; and

"(2) For which, to a reasonable degree of medical certainty, treatment of the irreversible condition would be medically ineffective."

**5.** Section 5–601(o) defines a "persistent vegetative" state as

two physicians, one of whom is a neurologist, neurosurgeon, or other physician who has special expertise in the evaluation of cognitive functioning, must certify that the declarant is in a persistent vegetative state. § 5–606(b)(2).

▇▇▇ Appointment by a declarant of an agent for health care is addressed in § 5–602(b)(1). An individual who is competent "may, at any time, make a written advance directive appointing an agent to make health care decisions for the individual under the circumstances stated in the advance directive." *Id.* An instrument appointing a health care agent must comply with the signature and attestation requirements for an advance directive. § 5–602(c). "[T]he threshold of inability for being declared 'incapable of making an informed decision' . . . must be reached before an advance[ ] directive, appointment of a health care agent, or surrogate decisionmaking may become operative to govern health care decisionmaking." J.F. Fader II, *The Precarious Role of the Courts: Surrogate Health Care Decisionmaking*, 53 Md. L.Rev. 1193, 1210–11 (1994) (footnote omitted). If a health care agent has been appointed, and if two physicians have certified as to the declarant's incapacity, there is no express requirement for physician certification that the declarant is in one of the three defined diagnostic conditions prior to withholding or withdrawing life-sustaining procedures.[6]

Another type of agent for health care under the Act is a surrogate decisionmaker. Under the priority scheme set forth in the Act, where the declarant has no guardian, spouse, or

---

"a condition caused by injury, disease, or illness:
 "(1) In which a patient has suffered a loss of consciousness, exhibiting no behavioral evidence of self-awareness or awareness of surroundings in a learned manner other than reflex activity of muscles and nerves for low level conditioned response; and
 "(2) From which, after the passage of a medically appropriate period of time, it can be determined, to a reasonable degree of medical certainty, that there can be no recovery."

6. But, *see generally* § 5–611(c); 79 Op. Att'y Gen. 137, 151 (1994); J.C. Byrnes, *The Health Care Decisions Act of 1993*, 23 U. Balt. L.Rev. 1, 39 n.107 (1993); D.E. Hoffmann, *The Maryland Health Care Decisions Act: Achieving the Right Balance?*, 53 Md. L.Rev. 1064, 1110 & n.182 (1994).

adult child, the declarant's parent(s) "may make decisions about health care for a person who has been certified to be incapable of making an informed decision and who has not appointed a health care agent." § 5–605(a)(2). The surrogate decisionmaker must base his decisions for the declarant on the declarant's wishes (substituted judgment), considering six factors outlined in § 5–605(c)(2)(i) through (vi), or, if the declarant's wishes are unknown or unclear, on the declarant's best interest. § 5–605(c). A surrogate decisionmaker's ability to withhold or withdraw life-sustaining procedures is limited to situations in which the declarant is certified by two physicians to be in one of the three defined diagnostic conditions. § 5–606(b).

The Attorney General has also opined that a durable power of attorney authorization under Maryland Code (1974, 1991 Repl.Vol., 1998 Cum.Supp.), § 13–601 of the Estates and Trusts Article may be used to authorize an agent to direct the withholding or withdrawal of life-sustaining procedures.

"A person (the principal) may use a durable power of attorney to direct an agent (the attorney in fact) to carry out the principal's specific directive concerning medical treatment, including the withholding or withdrawing of artificially administered sustenance under specified circumstances. Alternatively, a principal may choose to empower the attorney in fact to make all medical decisions on his or her behalf, rather than directing a specific treatment decision."

73 Op. Att'y Gen. at 184.

## II. The General Facts

On July 18, 1994, Wright, age 33, was transported by ambulance from his home to the Moore Clinic, an outpatient HIV facility at the Johns Hopkins Hospital in Baltimore City. He was suffering from AIDS and was, on that day, complaining of fever, a worsening cough, poor oral intake, and diarrhea. From the Moore Clinic, Wright was admitted as an inpatient to the Osler 8 medicine service at the hospital for evaluation and treatment. From July 18 until July 20, Wright

was treated in Osler 8 for acute renal failure. During that time his family regularly visited with him.

On July 20, Wright telephoned his mother to tell her that he would be coming home that day after he finished receiving a blood transfusion. The purpose of the blood transfusion was to increase his circulating blood volume, which tended to improve his well-being.

Within minutes after the transfusion was completed, Wright was found unresponsive and without a pulse. Dr. James Miller, the resident physician assigned to care for Wright in Osler 8, directed that cardiopulmonary resuscitation (CPR) be administered. Wright was also intubated to assist his breathing. Breathing and circulation were restored. Wright was then transferred from Osler 8 to the medical intensive care unit (MICU) at Johns Hopkins.

Wright's mother, father, and home health care nurse arrived at the hospital after having been informed of the incident.

A physician informed Wright's parents that it was their decision whether to keep Wright in the MICU or to send him back to Osler 8. The mother requested that Wright's breathing tube be removed and that he be sent back to Osler 8. She requested comfort care treatment only for her son.

The transfer order from the MICU to Osler 8, bearing date of July 20, states: "Pt. is DNR/DNI." [7] The transfer note, dated July 21, describes the occurrence as follows:

"[Patient] was found in full arrest today by nursing staff after receiving a blood transfusion. Total CPR @ 10 min. Successful intubation and conversion from course V-fib to supraventricular tach. Transferred to MICU. After transfer Osler 8 team informed by home health nurse that [patient] had written living will and expressed wish to be DNR/DNI.

---

7. "DNR/DNI" means "do not resuscitate/do not intubate."

· "[Patient] was extubated on MICU and continued to breath spontaneously. Transferred back to floor. . . .

"We will provide comfort care and make no further attempt to reintubate or resuscitate [patient] again per his expressed wishes." [8]

A consultation report written shortly after the occurrence concluded with certain recommendations, one of which read: "Would contact ethics committee to discuss medical-legal [and] ethical issues i.e., withholding of IVFs, nutrition, antibiotics etc."

Following the occurrence, Wright lay in a coma for two days. His mother testified that Dr. Miller informed her that Wright had suffered sixty-five percent brain damage. She further stated that after regaining consciousness Wright could only moan and call out for her. He died on July 30, 1994, ten days after his cardiac arrest.

Wright had been HIV positive since the mid–1980s and began treatment at Johns Hopkins around 1990. An assessment for HIV case management by Johns Hopkins was made on February 12, 1993. On his HIV Case Management Psychosocial Form, Wright checked a space indicating that he needed legal assistance and inserted the comment "Living Will, Power of Attorney." On his HIV Case Management Plan of Care worksheet, in the "Legal Concerns" section, Wright checked the preprinted goal reading "[d]evelop legal plans to meet present and future life planning concerns." On that same page, under the sub-heading "Life Planning Decisions," he placed a checkmark next to "Do not resuscitate (DNR)" and "Living Will/Durable Power of Attorney decisions."

Less than two weeks later, on either February 22 or 23, Wright executed a document entitled "Declaration of Life–Sustaining Procedures (Living Will)." Wright's Living Will directed that life-sustaining procedures be withheld or withdrawn in the event that two physicians (a) certify Wright to be

---

8. Other entries in the hospital record are generally to the same effect.

in a terminal condition as a result of any incurable injury, disease, or illness, and (b) determine that Wright's death is imminent and will occur whether or not life-sustaining procedures that would only serve to prolong the dying process were utilized. The Living Will was signed by Wright and his mother and attested by two witnesses.[9]

The first page of a document entitled "Durable Power of Attorney for Healthcare" is also in evidence. That page does not contain the spaces for signatures and a date. Wright's mother represented to this Court that Wright executed this document in February 1993. Page one contains the appointment of Wright's mother as his "agent to make healthcare decisions for [him] as authorized in this document," and the appointment of his father as alternate health care agent.

---

**9.** Specifically, the Living Will provided as follows:

"DECLARATION OF LIFE–SUSTAINING PROCEDURES
(LIVING WILL)

"On this _____ day of 2–22, 1993, I, *Robert L. Wright, Jr.*, being of sound mind, willfully and voluntarily direct that my dying shall not be artificially prolonged under the circumstances set forth in this Declaration:

"If at any time I should have any incurable injury, disease or illness certified to be a terminal condition by two (2) physicians who have personally examined me, one (1) of whom shall be my attending physician, and the physicians have determined that my death is imminent and will occur whether or not life-sustaining procedures are utilized and where the application of such procedures would serve only to artificially prolong the dying process, I direct that such procedures be withheld or withdrawn, and that I be permitted to die naturally with only the administration of medication, and the performance of any medical procedure that is necessary to provide comfort, care or alleviate pain. In the absence of my ability to give directions regarding the use of such life-sustaining procedures, it is my intention that this Declaration shall be honored by my family and physician(s) as the final expression of my right to control my medical care and treatment.

"I (do) (do not) *[draw a line through word(s) that do(es) not apply]* want food and water or other nutrition and hydration administered to me by tube or other artificial means in the event that I am in a terminal condition.

"I am legally competent to make this Declaration, and I understand its full impact.

/s/ Robert L. Wright, Jr.
Signature of Declarant)"

Page one states that Wright's mother's durable power of attorney for health care becomes effective upon the certification by two physicians that Wright is incapable of making certain decisions:

"2. Creation and Effectiveness of Durable Power of Attorney for Healthcare

"With this document I intend to create a durable power of attorney for healthcare, which shall take effect when and if two physicians, one of whom is my attending physician, certify that I am disabled because I lack sufficient understanding or capacity to make or communicate decisions with respect to my own health care. The power shall continue in effect during my disability."

The document also states what authority is granted to the health care agent:

"3. General Statement of Authority Granted

"Except as indicated in Section 4, below,[10] I hereby grant to my agent named above full power and authority to make healthcare decisions on my behalf; including the following:

. . . .

(5) To direct the withholding or withdrawal of life-sustaining procedures or measures when and if I am terminally ill or permanently unconscious. Life-sustaining procedures or measures are those forms of medical care which only serve to artificially prolong the dying process, and may include mechanical ventilation, dialysis, antibiotics, artificial nutrition and hydration, and other forms of medical treatment which stimulate or maintain vital bodily functions. Life-sustaining procedures do not include care necessary to provide comfort or alleviate pain."

Additional facts will be stated in the discussion of specific issues.

---

**10.** The remaining page or pages containing Section 4 are missing from the exhibit.

### III. Procedural History

The complaint contains four counts. In Count One ("Negligence–Survival Act"), Wright's mother, as personal representative of Wright's estate, alleged that on July 20, 1994, the defendants negligently administered CPR contrary to Wright's Living Will and "negligently failed to reasonably, timely and properly explore and/or inquire as to Decedent's intentions concerning resuscitation," which resulted in Wright experiencing "additional unnecessary neurological impairment, pain and suffering, and ultimately . . . a prolonged, painful and tragic death on July 30, 1994." In Count Two ("Wrongful Death"), Wright's parents alleged that Wright's suffering that resulted from the resuscitation caused them "mental anguish, unremitting grief and sorrow and pecuniary loss." In Count Three ("Battery"), Wright's parents alleged that the defendants "conducted an intentional, non-consensual harmful and/or offensive touching of the Decedent when they instituted resuscitative measures in violation of Decedent's advance[ ] directives and/or failed to timely explore Decedent's desires regarding resuscitative measures." In Count Four ("Lack of Informed Consent"), Wright's parents alleged that the defendants

> "failed to obtain Plaintiffs' informed consent in that they negligently failed to disclose to Plaintiffs all material information, including, but not limited to, the nature of the proposed treatment [i.e., CPR]; the probability of success of the contemplated resuscitation and its alternatives; the risks and unfortunate consequences associated with such a treatment; and were otherwise negligent in failing to provide them with proper informed consent."

The parents stated that "[a]ny reasonable person, under the same or similar circumstances, if provided with such material information, would have withheld consent to the treatment, and would have sought alternative measures and would not have been subjected to continuing pain and suffering." Pursuant to Maryland Code (1974, 1998 Repl.Vol.), § 3–2A–06B of the Courts and Judicial Proceedings Article (CJ), the plaintiffs elected to waive arbitration.

After taking Wright's mother's deposition, the defendants moved for summary judgment, arguing that they were statutorily immune from liability, that Wright's Living Will never became operative, that there is no legally cognizable claim for Wright's "wrongful life" damages, that no wrongful act caused Wright's death, that no battery occurred, and that the emergency of the cardiac arrest suspended the physicians' duty to obtain informed consent.

Wright's parents opposed the motions, filing an affidavit from Wright's mother and, later, an affidavit from Dr. William J. Brownlee. The plaintiffs argued that the defendants were not statutorily immune; that the Living Will was operative at the time of the resuscitation, or that, even if the Living Will was statutorily invalid, Wright exercised his common law right to refuse medical treatment; and that the administering of CPR was the wrongful act causing Wright's death. In a supplemental memorandum of law the parents argued that, contrary to Johns Hopkins's written policies, the defendants failed to place Wright's Living Will in his medical chart and failed to discuss the matter of resuscitation with him.

The circuit court entered judgment for the defendants for reasons stated in a lengthy written opinion. Much of the opinion reviewed facts as asserted by the plaintiffs and held that they did not alter the legal result. The court concluded that, at the time of his cardiac arrest, Wright was not in a terminal or an end-stage condition. Nor were the defendants "required to delay resuscitation even for the minutes required to seek and obtain either consent of a health care agent or formal medical certification of the decedent's pre-arrest medical condition as might warrant a declination to resuscitate."

With regard to Wright's Living Will, the court concluded that, although there may exist a dispute of facts as to "institutional pre-resuscitation knowledge of that advance directive," the conditions precedent to trigger the Living Will, that is, physician certification that Wright was in a terminal condition or imminently facing death, had not been met. With regard to oral directives by Wright the court held that, if the health care

providers who resuscitated Wright could be shown to have been on notice of contrary oral directives at that time, they were not documented in Wright's medical records as required under the Act and were, therefore, not binding on other, subsequently-involved physicians.

Further, agreeing with an opinion by the Attorney General, 79 Op. Att'y Gen. 137 (1994), the court held that certain uncertified oral statements by Wright lacked "reasonable clarity for informed medical implementation," and that there was no evidence that cardiac arrest had been predicted and particular consideration given to a DNR in that event.

Wright's parents appealed to the Court of Special Appeals. Prior to that court's consideration of the case, Johns Hopkins and the defendant physicians petitioned this Court for a writ of certiorari. Wright's parents cross-petitioned. We granted both petitions. *Johns Hopkins Hosp. v. Wright*, 350 Md. 280, 711 A.2d 871 (1998).[11]

## IV. The Issues

The parties have raised numerous and somewhat overlapping issues. They are:

1. Under the Act or the common law, does an individual, and, accordingly, the individual's estate, have a cause of action for a health care provider's failure to comply with the individual's advance directive?

2. Did the plaintiffs set forth sufficient facts to state causes of action for negligence, wrongful death, battery, and lack of informed consent?

3. Under the Act, does a sudden and unforeseen cardiac arrest render an otherwise non-terminal individual "terminal," thereby triggering the operation of an advance directive?

---

11. In the captioning of this opinion the parties' names have been reversed to reflect as the petitioners the parties who lost in the circuit court.

4. Under the Act or the common law, once an individual makes an advance directive, what measures must one or more individual health care providers at an institution take to notify other individual health care providers at the same institution of the advance directive?

5. Under the Act, is a health care provider immune from liability for providing life-sustaining procedures to an individual who has directed in advance that life-sustaining procedures be withheld or withdrawn in certain circumstances?

6. Under Maryland law, are the damages resulting from the administration of a life-sustaining procedure a compensable "injury"?

7. In an emergency situation, is a health care provider liable for providing life-sustaining procedures to an individual who has made an advance directive if the health care provider is unaware of the advance directive, believes the advance directive not to be operative, or cannot ascertain the individual's intentions regarding the provision of life-sustaining procedures?

We shall assume, *arguendo*, that the answer to the first issue is "yes." Nevertheless, because the answer to issue two is "no," we affirm the judgment of the circuit court. Accordingly, it is unnecessary specifically to address the remaining issues.

## V. The Negligence Claim

There are three aspects to the plaintiffs' contention that the defendants breached a duty to Wright to withhold resuscitation: (A) violation of the instructions in the Living Will; (B) violation of a statutorily recognized, oral advance directive; and (C) violation of a legally effective, oral DNR instruction that does not meet the formal requirements of the Act. In analyzing each of these arguments the evidence most favorable to the plaintiffs is that the Living Will was in Wright's chart at Osler 8 on July 20, 1994.

## A. The Living Will

■ Wright's Living Will was executed on either February 22 or 23, 1993, prior to the October 1, 1993 effective date of the Act. The Living Will was therefore executed pursuant to the then-effective Life–Sustaining Procedures Act, Md.Code (1982, 1990 Repl.Vol.), HG § 5–602. In fact, Wright's Living Will follows substantially verbatim the model form for a living will set forth in that prior law. *See id.* § 5–602(c). The Act, however, states that "[a] valid living will· or durable power of attorney for health care made prior to October 1, 1993 shall be given effect as provided in this article, even if not executed in accordance with the terms of this article." § 5–616(b). Therefore, Wright's February 1993 Living Will is governed by the Health Care Decisions Act.

Under the Act, an advance directive becomes operative either under the conditions specified by the declarant, or, if no such conditions are specified, upon the written certification of two physicians that the declarant is incapable of making an informed decision. § 5–602(e)(1). In this case, Wright did specify the conditions that trigger the operation of the advance directive. His Living Will provided:

> "If at any time I should have any incurable injury, disease or illness certified to be a terminal condition by two (2) physicians who have personally examined me, one (1) of whom shall be my attending physician, and the physicians have determined that my death is imminent and will occur whether or not life-sustaining procedures are utilized and where the application of such procedures would serve only to artificially prolong the dying process, I direct that such procedures be withheld or withdrawn, and that I be permitted to die naturally . . . . "

■ There is no evidence that any physicians certified that Wright was in a terminal condition and that his death was imminent. Therefore, under its terms the Living Will never became operative. As a result, even if the Osler 8 attending physician was on notice of Wright's Living Will, that advance

directive would not have precluded the attending physician from resuscitating Wright in the event of a cardiac arrest.

Wright's parents dispute that the Living Will was not operative. First, they contend that at the time of the resuscitation Wright's medical condition was terminal and his death was imminent. This argument, however, does not overcome the lack of the physicians' certification at the time of the resuscitation that was required to trigger the operation of the Living Will.

Second, Wright's parents submit that "[r]egardless of whether the written Advance Directive was operable in and of itself, it nonetheless operates as a clear directive of Decedent not to have any life-sustaining procedures performed on him." The Living Will actually indicates a contrary directive; that is, a directive to have life-sustaining procedures performed only in the specified circumstances which are to be determined to exist by two physicians.

Third, Wright's parents argue that Wright was extubated after the physicians "realized that the Decedent had signed an Advance Directive refusing life-sustaining treatment," thereby acknowledging that Wright's Living Will was operative despite the lack of certification. The direct and seemingly undisputed evidence from the medical records and from Wright's mother's deposition testimony is that Wright was extubated pursuant to his family's request and not the Living Will. Viewing the extubation solely in terms of the Living Will, and ignoring the mother's agency for health care, it was the withdrawal of life-sustaining procedures, without the conditions of the Living Will having been satisfied, that was not authorized. The plaintiffs, however, cannot complain of this deviation from the authorization of the Living Will because they requested the extubation.

### B. Oral Advance Directive

Nor is the Act's recognition of oral advance directives of assistance to the plaintiffs. An oral advance directive that is effective under the Act must be made in the presence of the

attending physician and one witness and must be documented as part of the patient's medical record. § 5–602(d). In this case the medical record does not document any oral directive, as that term is used in the statute.

## C. DNR Order

The plaintiffs direct their principal arguments to attempting to cobble from pieces of evidence a non-statutory, oral advance directive by Wright that his chart was to be coded DNR. It is undisputed, however, that no DNR order was in Wright's medical record. Further, Wright's mother admitted on deposition that she did not know whether her son ever expressed to Dr. Miller her son's wish "that if he got to the point where he was unable to eat on his own and breathe on his own, he didn't want those types of functions to be carried out by machinery." She also admitted that she did not know if her son expressed to anyone, other than herself, his wish that "if he had a heart attack he didn't want any measures taken . . . just let him go." In addition, Wright's mother admitted that, prior to Wright's cardiac arrest, she did not tell "any of the health care providers that if [Wright] had a sudden and unexpected heart attack, that he wanted the doctors to just let him go."

Against the background set forth above, the following portions of the record present the evidence most favorable to the plaintiffs.[12] In her affidavit Wright's mother states that it was Wright's understanding, as well as hers, that the Living Will was effective immediately "and in the event that it came [Wright's] time to go, [Wright] did not want any life-sustaining

---

12. The defendants object to portions of the "evidence" on which plaintiffs rely. These objections are based, *inter alia,* on the Dead Man's Statute, Md.Code (1974, 1998 Repl.Vol.), CJ § 9–116, and on *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984) and other cases holding that summary judgment against a party is not defeated by a conflict between that party's deposition testimony and the party's later affidavit opposing summary judgment. By presenting the portions of the record relied on by the plaintiffs, we intimate no opinion on the merits of the defendants' objections.

procedures performed on him." He "intended and understood the Living Will to include refusal to be resuscitated." After executing the Living Will, "on each occasion when [Wright] was to be admitted," including the admission on July 18, 1994, "Dr. Patricia Barditch–Cro[vo] asked [Wright] whether he had changed his mind regarding the Living Will, and [Wright] said he had not." In the six months preceding Wright's death, he was seen in the Johns Hopkins emergency room on at least two occasions. "On both [of] these occasions, [Wright] told the emergency room physician that he did not want to be resuscitated." During Wright's admission to Johns Hopkins immediately preceding the admission of July 18, 1994, Wright's mother "did see the Living Will in [Wright's] chart." On July 20, 1994, after the resuscitation, a nurse who was being consoled by Wright's home health care nurse said "that she had not looked in [Wright's] chart before she called the code." On July 22, 1994, while Wright's mother was visiting with him, "a nurse or nursing assistant told [her] that she didn't know how this could have happened when the living will was in [Wright's] medical records." Wright "made it clear to everyone, friends, family and his health care providers, that he did not want any life-sustaining procedures, including resuscitation, because he wanted to die with dignity."

In her deposition Wright's mother testified that upon arriving at the MICU the physician in charge of the MICU, who "was not a part of the [resuscitation] team," approached her and apologized on behalf of those who had resuscitated Wright. The MICU chief said that "[h]e knew that [Wright] had the DNR. He knew [Wright] had a living will on his chart and should not have been resuscitated."

■ The evidence relied on by the plaintiffs blurs the distinction between Wright's Living Will and a possible DNR order. The latter is an order that "speaks to a form of treatment, CPR, that would be applied, if at all, only after an unpredictable and dramatic change in the patient's condition—that is, if the patient were to suffer a cardiac arrest." 79 Op.

Att'y Gen. at 137.[13] The only evidence bearing on the standard of care for the entry of a DNR order is found in the Johns Hopkins Medical Staff Manual which sets forth that institution's established policy "to guide the physician when writing DNR orders."

"The Attending Physician has the responsibility to discuss with the patient ... the withholding of resuscitation when death is imminent and inevitable from an irreversible condition or there exists a high probability that this will occur during the course of the hospitalization, or may occur during an invasive diagnostic or therapeutic procedure."

Thus, the relevant period for the writing of any DNR order would have been while Wright was in Osler 8 with Dr. Miller as his attending physician. In his affidavit Dr. Miller states that "Wright's cardiac arrest was not an expected result of his underlying disease process, but rather an acute, but reversible, reaction to his blood transfusion." That opinion is uncontradicted. Indeed it was anticipated that Wright would be discharged to home following his blood transfusion, and he had telephoned his mother shortly prior to the transfusion to arrange for transportation. Further, the evidence most favorable to the plaintiffs is the opinion of the plaintiffs' medical expert that, as of July 18–20, 1994, Wright's life expectancy was less than six months. That is not "imminent" death in the context of the standard of care described above.

Thus, any vitality of plaintiffs' negligence claim turns on the legal sufficiency of the use of "resuscitation" in the oral statements by Wright to an unidentified emergency room physician on each of two admissions there prior to July 18, 1994, and in the oral statement by the physician in charge of the MICU. We hold for policy reasons that this evidence is not

---

**13.** The Attorney General defines cardiac arrest as " 'the sudden unexpected cessation of heartbeat and blood pressure. It leads to loss of consciousness within seconds, irreversible brain damage in as little as 3 minutes, and death within 4 to 15 minutes.' " 79 Op. Att'y Gen. at 140 (quoting Office of Technology Assessment, U.S. Congress, *Life–Sustaining Technologies and the Elderly* 168 (1987)).

legally sufficient. Here, none of the physicians involved in the statements was Wright's attending physician during the relevant period. We will not recognize these uses of "resuscitation" by or in the presence of physicians other than the attending physician to be the functional equivalent of the entry of a DNR order in Wright's chart at Osler 8. Simply put, if such a conclusory and unexplained oral statement can be the basis for finding that there was in fact a DNR order, so that an action for violating the order would lie, then an oral statement made without any explanation of its basis by a physician who was not attending prior to cardiac arrest would support withholding resuscitation. Life or death decisions are not to be made so casually.[14]

The Attorney General has recognized that a non-statutory, oral advance directive by a patient to an attending physician may be effective, under limited circumstances, to permit the entry of a DNR order. 79 Op. Att'y Gen. at 154. That opinion addressed the "difficult issue [of] the effect to be accorded a formerly competent patient's decision to decline CPR if the patient made the decision in a discussion with a physician that was unwitnessed and therefore is *not* an oral advance directive under the Act." *Id.* Competing considerations were recognized. It "would not be faithful to the General Assembly's purpose [to accord] the same legal effect to an unwitnessed statement as to an oral advance directive. To do so would make a nullity out of the witness requirement" which was intended to be "a measure of protection for the patient." *Id.* Yet, "the Act surely has not displaced entirely the legal right of patients simply to tell their physicians what they want and don't want, with informed consent." Effect must be given to the cumulative rights provision, § 5–616(a).

The principle applied by the Attorney General was that a person has a right to decide about future life-sustaining procedures. 79 Op. Att'y Gen. at 154 (citing 73 Op. Att'y Gen. at

---

**14.** There is no contention by the plaintiffs that the circuit court should have deferred ruling on the motion for summary judgment pending a deposition by the plaintiffs of the MICU chief.

185). In the cited opinion that principle undergirded the conclusion that a patient could "make a choice about life-sustaining procedures, including artificially administered sustenance, should that situation arise," without executing a formal document. 73 Op. Att'y Gen. at 185. Instead, "a person who is competent to make medical decisions at the time of decision about insertion of a feeding tube can decide whether to allow that procedure or not by simply telling the attending physician, who should document the decision in the patient's record." *Id.* Thus, in the 1994 opinion the Attorney General concluded:

"A competent patient's decision to forgo CPR may be given direct effect by entry of a DNR order, even if the patient is no longer competent and no health care [agent] or surrogate is available ... if the patient's decision, albeit not an oral advance directive, is the product of informed consent about contingencies in the discrete context of a discussion of 'a future course of treatment.' "

79 Op. Att'y Gen. at 154 (quoting 73 Op. Att'y Gen. at 185). The opinion, however, expressed the following caveat:

"But if the patient merely tells the physician of a generalized and open-ended desire to forgo life-sustaining procedures, including CPR, in the indefinite future, the decision may be given effect only as evidence that might allow some other decision-maker—a health care agent, surrogate, or guardian with court approval—to authorize a DNR order. Physicians need to be aware of the importance of having a witness to this more generalized type of patient decision in order to create a fully effective oral advance directive."

*Id.* at 154.

We agree with the analysis by the Attorney General. In the instant matter the evidence supporting the entry of a DNR order does not rise above evidence of a "generalized and open-ended desire" on Wright's part.

The foregoing conclusion answers a number of the plaintiffs' arguments. As we previously noted in Part V.A, *supra,* the parents contend that the extubation of Wright evidences that

the defendants could have applied the Living Will without a certification that the conditions therein set forth had been met. As explained above, Wright's mother, as his agent for health care, could, and did, give effect to her son's generalized intent, but the defendants could not give it effect, absent informed consent given by Wright in the context of an explanation of the contingencies of future treatment.

Plaintiffs additionally submit that the defendants breached a duty to Wright to record his expressed desires in his record. This submission merely recycles the argument that we have previously rejected. From the standpoint of our assumed legal duty on the defendants to honor a DNR order, a "generalized and open-ended desire" need not be recorded because it is not a DNR order.

Essentially the plaintiffs urge this Court to recognize a common law action for having administered CPR that would be viewed as unauthorized under the evidence most favorable to the plaintiffs in this case. In *Mack,* this Court foreshadowed the need for comprehensive legislation related to a patient's right to refuse medical treatment by declaring that changing the common law on matters related to this right was a "quintessentially legislative" function. 329 Md. at 222, 618 A.2d at 761. The Act, enacted several months after the Court's decision in *Mack,* was the product of intense intellectual debate between judges, attorneys, academicians, ethicists, and physicians and drew on two competing bills submitted to the General Assembly. For a detailed account of the evolution of the Act, see D.E. Hoffmann, *The Maryland Health Care Decisions Act: Achieving the Right Balance?,* 53 Md. L.Rev. 1064 (1994), and J.C. Byrnes, *The Health Care Decisions Act of 1993,* 23 U. Balt. L.Rev. 1 (1993). We shall not use our power to declare the common law to move the line between an authorized and an unauthorized DNR further from the statutory, oral advance directive than the type of DNR order that we have recognized above as authorized. The legitimate public policy concern for protecting the patient does not permit embracing within the authorized DNR order one entered on the basis of a generalized desire that has not been

translated by informed consent into a discrete plan for future treatment contingencies.

For all of the foregoing reasons, under the circumstances here, the CPR was authorized by the treatment without consent provision of the Act, § 5–607.[15]

## VI. The Other Claims

The parents alleged in their complaint that the defendants "failed to obtain [Wright's parents'] informed consent in that they negligently failed to disclose to [Wright's parents] all material information, including, but not limited to, the nature of the proposed treatment [i.e., CPR]; the probability of success of the contemplated resuscitation and its alternatives; the risks and unfortunate consequences associated with such a treatment; and were otherwise negligent in failing to provide them with proper informed consent." [16] Section 5–607, under which the CPR was authorized, accords with the common law doctrine of informed consent, which is suspended in an emergency situation. *See Sard v. Hardy*, 281 Md. at 438–39, 379 A.2d at 1019 ("The doctrine of informed consent . . . follows logically from the universally recognized

---

**15.** Section 5–607 reads:

"A health care provider may treat a patient who is incapable of making an informed decision, without consent, if:

"(1) The treatment is of an emergency medical nature;

"(2) A person who is authorized to give the consent is not available immediately; and

"(3) The attending physician determines that:

"(i) There is a substantial risk of death or immediate and serious harm to the patient; and

"(ii) With a reasonable degree of medical certainty, the life or health of the patient would be affected adversely by delaying treatment to obtain consent."

**16.** Wright's parents' cause of action for lack of informed consent is properly a cause of action for negligence. *See Faya v. Almaraz*, 329 Md. 435, 450 n. 6, 620 A.2d 327, 334 n. 6 (1993) ("The cause of action for lack of informed consent is one in tort for negligence, as opposed to battery or assault."); *Sard v. Hardy*, 281 Md. at 440 n. 4, 379 A.2d at 1020 n. 4 ("We note in passing our approval of the prevailing view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence, as opposed to battery or assault.").

rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.").

 Plaintiffs' wrongful death claim is without merit. The action lies "against a person whose wrongful act causes the death of another." CJ § 3–902(a). Here the alleged wrongful act, CPR, caused Wright to live.

It appears that in this appeal Wright's parents have abandoned their battery claim. While they preserved the claim in their cross-petition for certiorari, they have made no argument in support of the claim in their brief to this Court. Further, in their reply brief Wright's parents have failed to respond to the defendants' assertion that Wright's parents "have abandoned any claim that the Circuit Court erred in its dismissal of the Wrights' battery claim."

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS AND CROSS–RESPONDENTS, JEANETTE WRIGHT et al.*